Danforth, J.,
(dissenting).—The action was to recover damages for injuries sustained by the next of kin of Philo P. Woodward, from one of the defendant’s trains having struck and killed Mm while on a public street in the village of Hornellsville. The case was submitted to a jury, and they found for the plaintiffs. The defendant moved at special term upon a case and exceptions for a new trial. It was denied, and, after judgment, the defendant appealed from the order denying a new trial and from the judgment, to the general term, where both were affirmed. It now appeals from the decision of the general term, and brings up for review the order and judgment.
In support of the appeal, the learned counsel for the appellant argues that the trial court erred, first, in refusing to grant a nonsuit when moved to do-so, “ upon the ground that the proof did not show that the deceased was free *174 from contributory negligence,” and, second, in refusing to charge in certain particulars, as requested by him.
The court, after calling the attention of the jury to the facts in evidence, so fully and fairly as to suggest to the defendant no need of alteration or addition, said: “The law required of Woodard in crossing that railroad that he should look in every direction from which danger was liable to approach, and if he saw a train of cars, or a single car “approaching him in such manner as to threaten him with collision, it was his duty to stop and wait for it to pass, or hasten his steps so as to cross before it reached him, and this he must do at his own risk. But the evidence is that these men did not see the cars that were approaching. The plaintiff has proved by Phelps that he did not seethe cars approaching; that after he passed the corner of the Grotty building, he turned his eyes in that direction, and did not see them approaching. What was the reason of that? The cars were approaching, and the atmosphere was clear, and his eyesight was good enough to enable him to perceive them. Was it because his look in that direction was before he arrived at the point from which he could see up the track to where the cars were? If so, and he did not look again, he was guilty of negligence, which would prevent Mm from recovering for any injury he received, unless there was something else to draw off his attention, at the time he might have seen these cars approaching.”
After some other remarks, he added: “ In discussing this, question, you are to inquire, did Woodard exercise that degree of care and caution for his own safety which a reasonably careful and prudent man would have exercised under the same circumstances. If that fact is established satisfactorily to your minds, a cause of action is made out, and the plaintiff is entitled to recover; if not, no cause of action has been made out.”
No exception was taken to this or any other exposition of law applicable to the evidence, but the defendant’s counsel at the close asked the court to charge the jury that the proof showed that the approaching cars which struck Woodard could be seen during the entire time he was crossing ten feet to the track, and-that he had ample opportunity to see them, notwithstanding the passage of the-other trains.
The court: “I think I have covered that ground. I have said that the cars were in sight during the time he was passing over those ten'feet, and unless there was something-else that distracted his attention, he was bound to have seen them.” Nor was there any exception taken to this statement. The learned counsel then requested the court to charge as matter of law “that there was no passage of *175 other trains sufficient to justify him in not looking.” The court replied, “I leave the question to the jury.” To this there was no exception. The learned counsel for the defendant subsequently asked the court to charge “that as a. general rule, a party approaching a track is bound to look for approaching trains up to the time he steps on the crossing.
By the court: “As a general rule, that is so. Having looked at a distance of ten feet or fifteen feet from the rail, and not seeing an approaching train, would not relieve him from the responsibility of looking again. It is only for the jury to say whether there were circumstances which properly attracted and diverted his attention from the approaching cars.” And to this the counsel for the defendant excepted.
The propositions which allege error must stand or fall upon facts disclosed on the trial, and so require from us an examination of the entire evidence, for the contention of the appellant now is that no facts are established “from which the negligence of the defendant and the absence of contributory negligence on the part of Woodard could be legitimately inferred.” And this examination is to be made in view of the entirely well settled rule uniformly applied by the courts when the issue is one of fact and the case triable by a jury; that the question cannot be taken from them if the evidence in any reasonable view would warrant, a verdict, or, as was said in the recent case of Bagley v. Bowe, decided in this court March 25, 1887 (6 N. Y. St. Bep., 842), “if there is ground for opposite inferences, and a conclusion either way would not shock the senses of a reasonable man, then the case is for the jury, although the judge may entertain a clear and decided conviction that the truth is on this or that side of the controversy.”
It is difficult in many cases to distinguish between the province of the court and the province of the jury, but the hüjdicíal mind cannot be put in the place of the mind and ponscience of the juror without disturbing the fine which should separate the two and creating endless confusion. The opinion of one. person, however learned, cannot be substituted for the unanimous concurrence of twelve; and in this case, the question the trial judge- had to decide was not whether if he had been on the jury he would have found that there was negligence of the defendant and no negligence of the person killed, but whether there was evidence from which a jury might reasonably so find.
If as the appellant claimed by his motion for a non-suit, and his exceptions, and by this appeal, there was no dispute about the facts, was there not ground for dispute as to the proper inference to be drawn from them ? The *176 learned judge held that there was, and the only question before us is whether he decided rightly. The appellant asserts there was no such evidence, that there was no dispute about the facts nor any weighing of conflicting testimony, but an entire lack of evidence upon the affirmative of the issue. If he is right then the plaintiff’s case rested on averments only, and not only the trial court, but the special term and the judges of the general term are in error, for all agreed that the case called for something more than an opinion of the court upon a mere matter of law arising upon facts not disputed.
The facts as disclosed in evidence were as follows: The defendant’s road runs through the village of Hornellsville, in a south-easterly and north-westerly direction, and in so doing crosses with six tracks at an acute angle the most traveled street in Hornellsville, known as Oanisteo street. About noon on the day in question the decedent was north of the railroad, and on the west side of Oanisteo street at Houck’s coal yard, and with one Phelps left that place carrying between them a bushel basket full of coal for delivery at Phelp’s house, south of the railroad. They went in that direction along the west walk, the decedent being on the outside and having hold of the basket with his right hand, until both passed the northerly rail of the first track, and Phelps cleared the other, but Woodard was run into by two loaded box cars and thrown down, the brake beam caught him, and after going about thirty feet the cars lost their momentum, and when taken from under the wheel he was found to be badly injured and soon after died. Whether his death was caused by these injuries or was the natural result of the medical and surgical treatment he received, was one of the questions mooted by the defendant upon the trial. But it was submitted to the jury in a manner satisfactory to the defendant and the propriety of their verdict in that respect is now questioned. Whether the injuries were caused by the negligence of the defendant anc* whether the decedent exposed himself to danger voluntar* ily, are the only subjects of inquiry.
First. Was the defendant negligent ? Upon this inquiry very few words will answer. From a point about 250 feet west of the street crossing, and to a point east of it, the grade of the railroad is descending. The yard-master controlled an engine and by it so impelled the cars in question that when detached they had acquired such momentum as carried them rapidly down the descending grade. “The velocity,” says the defendant’s witnesses, “depends on the push from the engine. The purpose is to send the cars across the switch to the yard.” So it was this morning. The yard-master, who superintended the operation, said: *177 “We could keep the engine attached and have control of the train,” but they did not, and, continues the same witness, “We were clearing the switch. We would couple together from the west end and then pull up, throwing the loaded cars back in on the switch. We were doing this that morning; the engine was standing 250 or 300 feet from the westerly line of the street; I was standing at the lever to move the rail to let the cars run on the switch; that ‘point is about 150 feet west of Canisteo street; I think two or three cars struck Woodard.” As there was no engine attached to these cars so “pushed” or “kicked” forward, so there was no person in charge of them, nor any method to control or stop them, nor was there notice of any kind by bell, whistle, or flagman of their approach. They were simply stored with energy and put in motion by the locomotive and let go, to stop only when the power was exhausted, or some impediment, whether dead matter or, as in this case, a living body came in their way. Not only does the evidence show the general use of the street at this place, but that at the very time of the accident there were several persons upon it, and many tracks in use by trains running or stationary. Yet upon an oath of an officer of the defendant it was made an issue by its pleadings whether such a crossing of the street by the railroad was a dangerous crossing, and whether, in respect to it, there was default or negligence on the part of its servants or agents. As to the first, there can be no question, and, in the omission of the defendant to adopt some precautionary measures to lessen the danger to which a wayfarer was exposed, a court or jury would be of little use if they failed to find corporate culpability, or in view of the statute regarding signals from the locomotive at the crossing of a public road, to find that the deceased came to his death by the direct negligence of the railway company. The statute (Laws of 1850, chap. 140, § 39), imposed upon this defendant the absolute duty of placing a bell upon the locomotive, whose agency caused the injury, of ringing that bell at a distance of at least eighty rods from the street crossing and continuously ringing it until it should have crossed the street, and, for failure to do so, subjected it not only to a penalty, but to a liability for all damages which should “ be sustained by any person by reason of such neglect.” It would be a mere evasion to say that the duty could be avoided by detaching the engine while allowing the cars to run by power already communi coted by it.
Great as are the privileges of the defendant, it has no right to carry on its business in such a manner as is likely to injure others. That it did so on this occasion is legally *178 and morally certain. A similar act has been characterized by this court as one of “gross and criminal negligence.” Brown v. N. Y. C. R. R., 32 N. Y., 597.
The first branch of the plaintiff’s case, therefore, was established in the most conclusive manner, and although the defendant, as we have seen, went into evidence, there was no pretense of the slightest caution in its conduct of the. affair, or of any exigency which compelled its omission. As the case stands the death of the intestate can hardly be regarded as accidental, but the inevitable and natural result of the defendant’s method of business. Can we, with like assurance, hold there was not evidence .upon which the triors of fact could fairly say' the deceased exercised that ordinary care and prudence which the law required from him under the conditions and circumstances in which he was placed? We have nothing from his mouth. We know of him, however, that he was in the prime of life; that he had a wife and three children, with whom he lived and for whom he cared; that he was steady, sober and industrious, serving in the same employment for twelve years and losing no day until this injury; and while neither these conditions nor the character of the man which they imply can take the place of that evidence of the exercise of due care which the law requires from one going into a place of peril, they are for the consideration of the jury and do add to the weight of testimony relating to his conduct and tending to show that he did not bring the misfortune upon himself.
What was his conduct? From the coal yard whence he ' started he could* plainly see so much of the railway as intersected the street; he could see east of the street; but no further to the west than the west side of Grotty’s store, thirty-one and a half feet from the place where he was struck. At that point, by directing his eyes upon a line exactly at right angles with the store, he could take in fifty-seven feet more. But there was then in view, and directly in his way, the six tracks of the defendant. The first and second tracks, so far as could be seen, were unoccupied; on the third track a number of empty coal dumps, or cars were moving from the west, and a long freight train, or “train of boxcars,” drawing out “under pretty good motion ” going west at the rate of five or six miles an hour, or, as one witness thinks, fifteen miles an hour, was-on the fourth track, making the usual noise of a train in motion; its bell also was ringing
All such things tend to attract the attention of a wayfarer, and the decedent, whose way the trains obstructed, might lawfully, as he would naturally, turn his thoughts to them. He was of course bound as he approached the *179 defendant’s premises to observe every precaution to avoid danger which the law requires of a traveler at a railroad crossing. As to this, the law is not unreasonable. I am not aware of any rule which exacts from one approaching a crossing more than the exercise of ordinary prudence, nor of any exposition of that rule which reduces to a formula his way of procedure. The cases which call for its interpretation come before the courts with painful reiteration, but the answer is uniformly the same. Those cited by the learned counsel for the appellant form no exception. To recite them in detail would be useless, for the reason on which they turn is apparent upon the slightest inspection, and if there is a seeming conflict, it is because of the peculiar facts of the particular case, and not because there has been any departure from the principle which lies at the bottom of the rule above stated. All that the law requires is a reasonable use of the senses. According to the testimony, the intestate and his companion did not approach the railroad without looking and listening. As already suggested they could see nothing west of the crossing until they came within a short distance of the rail; by turning half way around they could command fifty-seven feet; as they proceeded and came within ten feet, they could see further. They did look. Phelps says: “As we approached the railroad I cast my eyes up as far as I could to the right to see by the Grotty block, and 1 saw nothing only the train going west. Asked: “W ere there any engines anywhere around;” he says, “I cast my eyes up the track by the corner, as we'went along and I was watching the trains on the third and fourth tracks.” As they get on the first track the cars ran down upon them. Asked by defendant’s counsel: “You were listening to the trains that were going to the west as you approached the tracks? A. One of them was going west and the dumps were going east.” Q. Were you listening to them? A. Yes, sir, and watching them. Asked if he noticed the bell on the west bound train, he says: “I did.” Asked if he heard it, he says: “I did. ’’Asked if he heard it, he says: “Yes.” Asked: “You were not aware there was an engine up towards Taylor street (this was west), before you were struck?” Answered: No, sir. Asked: “You were not listening for any engine up that way?” Answered: “As I was approaching the track I cast my eyes up that way. Q. Were you listening for any engine up that way? A. We were not expecting any engine or any cars from that way?” Q. “Your attention was not directed to the fact that there were cars coming down on that track? A. If it had been we shouldn’t have gone on the track; we had no warning of it; I did not hear the cars coming down. Q. When you got *180 past Crotty’s building, did you look up to see whether there was an engine or train coining ? A. Yes, sir. Q. Was that as soon as you got by'this building ? A. It was between there and the track. Q. Can you tell where it was ? A. I had probably got half-way down. Q. You looked up and didn’t see anything, and then you began to look at the other trains to see when they got across so you could pass? A. Yes, sir. Q. Your attention was diverted by these trains until you were struck ? A. Yes. Q. You had got pretty near across the track when you were struck? A. Yes, sir. Q. You were thrown between the tracks and Woodard about the centre of the track? A. It appears about that way. Q. As you looked, these two cars were not in view? A. No, sir.
The Crotty store came up to within six feet of the north or first track, and until you passed that point you could see only fifty-seven feet of the track west. Snyder was on Loder street north of the railroad, opposite Crotty’s block, the street intersecting Canisteo street; he was on the comer. He saw the men and the box cars overtake them. He was facing west, wanting to cross, but waiting for the westbound train to pass. Bennett was on the south side of the railroad and on the east side of Canisteo street. He also was waiting for the west-bound train to pass, that he might cross. He saw Woodard and Phelps and says: “As they approached the track there was a freight train coming up under pretty good motion, and they looked across and there were some coal dumps.” Q. Before they were struck by the car, did you see whether they looked around or not? A. When they approached near the track they cast their eyes over, as I should judge from the appearance of the men turning their heads and eyes. Q. Which way? A. Both directions. Q. Which directions? A. East and west. Asked by defendant’s counsel: “ Was it before or after the west-bound train had passed Canisteo street that you saw Phelps and Woodard looking up and down?” and answers, “It was before.” Asked: “When you saw these gentlemen looking around they were pretty near the door of Crotty’s store, about opposite?” Answered: “When they were looking at- the cars they were down pretty near the track, past the corner of the building.”
The cross-examination was protracted, testing with much detail the memory, steadfastness and observation of the witness, and conducted, after the Socratic method, with questions leading to the desired result, but closing as follows: Q. You were looking out for that west bound train when you came up ? A. No, sir; I was watching the switch engine; as they cut the cars loose I saw them and this train come up. Q. And you saw these gentlemen looking around ? *181 A. Yes, sir, Q. Did you see both their heads turn ? A. I think I did. Q. Do you know that they looked up at all ? A. All I judge from was from the motion of their heads and the appearance of the men; Morhess was standing on the east side of Canisteo street and the north side of Loder street; saw Phelps and Woodard going towards the railroad; they seemed, he says, to halt when they got to first track; then they moved on; when he first saw the box-cars they were coming in right from behind Grotty’s building; they were going without much noise; they were running quite fast; there was no man on the train, no one to stop it, and no flagman; he thinks Woodard looked to the right (the west), but is not clear; on cross-examination he could not say whether both looked to the right or not; Cook, a policeman on duty about three rods from the men, saw them approaching; saw the moving dump-cars, the moving box-cars and the train going to the west; as they stepped on the track they seemed to be observing the trains moving in front of them; I saw them, he says, moving across the track; they had nearly left the track when it (the box-car) struck them; it struck Phelps first; then Woodard; knocked Woodard in front of and under the cars and out of my vision; the ground, he says, was frozen and covered with snow; the box cars were very quiet; they were running very still; the cars were running with such velocity that Woodard’s body was moved by them thirty or forty feet; the train going west was making considerable noise; the rattling of the cars and the puffing of the engine; the dumps also were making more noise than the box-cars, and there were more dumps than box-cars. This witness also proved that the company had been in the habit of having “a flagman there all day;” at this time, however, the flagman was not there. This was well proven: That the flagman theretofore stationed at that point on the north side of the crossing was then absent, and on the other side of the six tracks, himself entirely out of sight from the north crossing; nor could he himself see anything of the accident. So he testifies. For any useful or available purpose he might have been altogether absent. So far as persons coming from the north were concerned, he was off duty or withdrawn. All these circumstances are to be considered in determining whether Woodard, by any omission on his part, contributed to the injury. He was familiar with the crossing, and charged with knowledge that the defendant had been (I use the language of one of the witnesses) “in the habit of having a flagman there all day.” The track had, indeed, been often used for switching, but there is no evidence that ever before cars had been shunted or kicked, or pushed, or discharged down what the defend *182 ant’s witness styles “a grade heavily descending east,” in the absence of the flagman, nor, but that on every other occasion, he was there to ward off the danger which might reasonably be anticipated by any intelligent person as likely to occur from such conduct on the defendant’s part.
His absence on this occasion was notice that nothing of the kind was to be attempted, and a wayfarer, familiar with the conditions theretofore observed by the defendant in the use of the crossing, might naturally conclude that no use of the south track was then intended, nor any car about to pass, but if danger lay in one direction, equal danger must be apprehended in the other. Then there were the two moving trains, either of which threatened danger and served to attract the attention of the intestate. And we have the fact, sworn to by more than one witness, that he did look and observe, and was alert in the use of his senses. Nothing more does the law require from one intending or about to enter upon a place of danger. Was it negligence not to have seen the car by which he was hit in time to have stopped? It not only gave him no warning of danger, but the flagman, usually in attendance, and whose known duty it was to guard the crossing and furnish notice to the traveler at this most dangerous place —dangerous only by reason of such act of the defendant as is now complained of-—was absent, and this absence was an affirmative assurance of safety. On the third track there was the train of coal or dump cars coming from the west, and from the east, the long train, -with its locomotives making the usual noise, while from the first track there was nothing to be heard, nor any notice of approaching danger. The sense of hearing and the sense of sight might-naturally be diverted by the objects before him, and his watchfulness affected by reliance upon the discharge by the-company ef its duty to run its trains over the crossing with the usual signal and under the observation of a flagman. It may be presumed that on other and previous occasions care had been taken, and that this care was known to the , decedent, so that as he may be chargeable with notice that the switch was used by the defendant, it was notice that the use was under safeguards and precautions upon the continued use of which he had the right to rely. Not only the evidence, to which I have referred, established that the decedent looked before entering upon the track, but the argument of the appellant concedes it. He claims only that he did not look at the right time, “did not look after he could have an unobstructed view of the cars,” that is, while passing over a space of ten feet. This was a question for the jury. The time and manner of observation at a place of danger, on the part of a prudent and careful man, would *183 be regulated not alone by the .circumstances inwhícn.he found himself, but as that danger would depend upon the action of the defendant, his conduct would also be directed in the light of the experience he had of that action on similar occasions, and it should not be permitted to have an advantage of an omission on his part which its change of conduct produced.
The elaborate briefs of counsel on this appeal seem to show little uniformity in the decisions of courts upon the questions here involved. It is not likely that there will be, for facts vary and inferences which are natural in one instance, would appear to be unreasonable in another. Yet one rule of action' runs through them all—precautions by a corporation where circumstances make a street crossing a place of danger, and ordinary care on the part of a wayfarer lest he encounter it. Here on the part of the defendant there was literally no precaution, but an absolute and unexplained indifference to the life and safety of the citizen. On this part there was at least an apprehension of danger and attention to his conduct in respect to it. Whether it was sufficient could be determined only by the jury. The specific proposition submitted to the trial judge shows upon what a narrow point the defendant sought to take it from, them. The motion for a non-suit was on the broad and general ground that the “ proof did not show that the deceased was free from contributory negligence.” The request subsequently made assumes that the proof showed that while passing over “ ten feet ” to the tracks approaching cars could be seen, “that as he then had opportunity to see them he was bound to do so.” In other words the claim is that “the law assumes not only that he did see them, but saw them in time to save himself, and as he did not save himself, his death was the result of his own want of care, and so not the result of the defendant’s negligence.” The proposition is not sound. It excludes most of the. circumstances which make such a crossing dangerous, and the presence of which demand the attention of a prudent person. It excludes the conduct of the defendant and the condition of things caused by it. It disregards rules well settled in this state in regard to the relative duties of a traveler and a railroad company. The crossing was dangerous only when the defendant made it so by propelling its cars across the street. It was permitted to do so upon giving certain statutory signals. It not only omits to give those signals at its peril, but the omission of those or other customary signals is regarded as an assurance by the company to the traveler that no engine is approaching from either side within eighty rods of the crossing, and he may rely upon such *184 assurance without incurring the imputation of negligence or breach of duty to a wrong doer.
A defendant, say the court, in the Ernst Case (35 N. Y., 39), “ cannot impute a want of vigilance to one injured by his act or negligence," if that very want of vigilance were the consequence of an omission of duty on the part of the defendant.” The jury might well find in words formulated in the case cited (supra), that the direct tendency of these omissions was to put the intestate off his guard, to disarm his vigilange and to produce a false sense of security.
It may indeed be that notwithstanding the omission of these signals and the absence of the flagman, he might by greater vigilance have discovered the approach of the c.ars, if he had foreseen a violation of the statute or the withdrawal of the customary guard, and whether in failing to do so he failed in' the observance of such a degree of care and diligence as men of ordinary prudence under similar circumstances usually employ was a question for the jury. He did look and listen. He did not go upon the track heedlessly. There were circumstances calculated to divert his attention from the first track, from which no danger was to be expected, to others which he had yet to cross, and it was impossible to say as a matter of law that he should have looked from some other point or in some other direction. Nor can it be said, as matter of law, that if he had looked at that other time, or from that other point, he could have seen the moving cars in time to escape. The law only declares that such a wayfarer must use his eyes and ears in view of all the facts and circumstances of the case as men of ordinary prudence placed in a similar situation would do, and the trial court did not err in submitting the case to the jury and leaving to them a consideration of all the facts likely to influence his conduct and so determine whether they were such as demanded his attention or as-distracted it. In Ernst v. Hudson River R. R. Co. (supra), those questions are discussed with great fullness and similar conclusions reached. They have been repeatedly applied by us to other cases referred to by the respondent’s counsel, and they need not be cited here.
But the general propositions which the appellant makes are both answered by the more recent case of Glushing v. Sharp, Receiver of R. R. Co. (96 N. Y., 676), where in an. action for injury, at a crossing the omission of signals and the action of the gate keeper were held conclusive as to the-negligence of the defendant, and the court says: “The evidence shows that no bell was rung or whistle blown and that the gate was raised, and thus the carelessness of the defendant was established. But the claim of the defendant' *185 is that the plaintiff should have been nonsuited on account of his own carelessnes, and this claim he' bases upon these facts; that at the place where the plaintiff looked, about thirty feet from the railroad track, his view was somewhat obstructed and that he did not look again while passing the thirty feet, although during that space his view was unobstructed and he could have seen the train if he had looked. We thjnk the case as to plaintiff’s negligence was properly submitted to the jury. He looked both ways, and whether, under all the circumstances he should have looked again or continued to look, was for the jury to determine. The raising of the gate was a substantial assurance to him of safety, just as significant as if the gateman had beckoned to him or invited him to come on, and that any prudent man would not be influenced by it is against all human experience. The conduct of the gateman cannot be ignored in passing upon plaintiff’s conduct, and was properly to be considered by the jury with all other circumstances of the case.” These remarks have precise application here: the absence of the flagman, the absence of any signal, were assurance persuasive in like manner as the acts and omissions referred to in the case cited. .
So it was decided in the Greany Case (101 N. Y., 420), following the Glushing Case, and in Sherry v. N. Y. C. & H. R. R. R. Co. (104 N. Y., 652; 5 N. Y. State Rep., 574). In view of these decisions are the general and well settled rules of law which these cases only reproduce and illustrate. The trial judge committed no error in refusing to take the case from the jury and submitting it as he did under proper directions to them. Another tribunal whose duty it also was to examine the facts as well as the law has affirmed the decision made by the trial court. I find no ground on which the judgment of these courts should be reversed. It should, I think, be affirmed.
Ruger, Ch. J., and Andrews, J., concur with Danforth, J.