\* JEREMIAH CALLAGHAN, as ADMINISTRATOR, ETC., OF THE ESTATE OF JULIA CALLAGHAN, DECEASED, APPELLANT, *v.* THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY AND THE NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY, RESPONDENTS.

*Gate-tender at a railroad crossing — effect of his action in raising the gate and beckoning a. person to drive across the track — liability of the company a question for the jury.*

In an action, brought to recover damages for the death of the plaintiff's intestate, his wife, which was alleged to have been occasioned by the negligence of the defendants, it appeared that at West Genesee street, in the city of Syracuse, the street and the defendants' tracks crossed each other at an angle of about fifty-five degrees, the street running nearly east and west and the tracks nearly north and south. The westerly track was used by the Delaware, Lackawanna and Western Railroad Company, and the two easterly ones by the New York Central and Hudson River Railroad Company. Gates were placed on the roadway, one on the east and the other on the west of the tracks.

A team, driven by the plaintiff, approached the crossing from the east and, the gates being down, stopped a little way from the east gate while a train on the New York Central track passed by, going from the city north. As this train passed the gate-tender began to raise the east gate, and as the bars went up the team started along under the gate to cross the tracks. As the team came upon the New York Central tracks the people in the wagon, for the first time, saw a train on the Delaware, Lackawanna and Western track approaching them, coming from the city towards the north. The gate-tender did not raise the west gate at all. He beckoned the people in the wagon to drive on across the tracks. Plaintiff, who became frightened and excited, whipped up his team and drove across the tracks, and when on the Delaware, Lackawanna and Western track the train struck the wagon, and the plaintiff's intestate who was in the wagon was killed and the plaintiff himself injured.

The two trains were going in the same direction, pretty fast, the one some rods behind the other. The smoke of the engine of the front train settled down upon the track behind it, and there was a curve towards the east as the tracks approached the crossing from the south.

*Held,* that as the gate-tender was situated where he had a favorable view of the tracks the people in this wagon had a right to suppose, when the gate-tender raised the east gate, that he intended to raise the west gate immediately thereafter; that no trains were coming, and that the team might safely pass over the track at the crossing.

\* Decided February, 1889.

That, whether they did rely upon this act of the gate-tender and, therefore, made less vigilant use of their eyes than they would otherwise have done to discover whether a train was coming, and whether they were justified in so doing; and whether they failed under the circumstances, in view of the raising of the east gate by the gate-tender, to exercise such a degree of care and caution as an ordinarily careful and prudent man would have used, were questions of fact for the jury.

That a judgment in favor of the defendants, entered upon an order directing a nonsuit and a dismissal of the plaintiff's complaint, should be reversed.

*Glushing* v. *Sharp, Receiver* (96 N. Y., 676); *Lindeman* v. *New York Central and Hudson River Railroad Company* (42 Hun, 306) followed.

*It seems* that, in the absence of gates and a gate-tender, it would have been the duty of the people in the wagon, after the first train had passed by, and before the team was driven upon the tracks, to look out for any other trains that might be coming upon the tracks, and that if there was smoke from the first train, which obstructed the view, to wait until the smoke cleared away and the view was unobstructed. (Per WILLIAMS, J.)

APPEAL from a judgment in favor of the defendants, entered in the office of the clerk of Onondaga county on the 16th day of March, 1888, upon an order made at the Onondaga Circuit nonsuiting the plaintiff and dismissing his complaint, with costs.

The action was brought to recover damages for the death of plaintiff's intestate, his wife, alleged to have been caused by the negligence of the defendants. The trial court disposed of the case upon the ground that there was no evidence for the jury as to the absence of contributory negligence.

The accident occurred in the city of Syracuse, at the West Genesee street crossing of defendant's tracks, about two o'clock in the afternoon. The street and tracks crossed each other at an angle of about fifty-five degrees; the street running nearly east and west, and the tracks nearly north and south. There were three tracks side by side; the most westerly one being the Delaware, Lackawanna and Western, and the two easterly ones the New York Central. The three tracks were protected by gates across the roadway, one east and the other west of the three tracks. Each gate consisted of two wooden bars, one fixed on either side of the roadway; the bars meeting in the middle of the roadway when lowered; the two gates were operated, each by a separate crank, the cranks being, however, at the same place, which was west of the three tracks and north of the roadway. A gate-tender was kept at the crossing to operate the

gates. At the time of the accident plaintiff was driving a team of farm horses, attached to an ordinary lumber wagon. He sat upon a seat near the front of the wagon, on the right hand side; his wife, the intestate, sat next to him on his left, and one Mrs. Foley sat at her left, and on the left hand side of the wagon. Mrs. Foley's son was behind the seat in the wagon. These people lived in a country town of Onondaga county. They came into Syracuse early in the day with farm produce for sale, and at the time of the accident were going out to Geddes, to the house of Mrs. Foley's daughter. The day was cold, and it was cloudy. As the team approached the crossing from the east the gates were down; the team stopped a little ways from the east gate, and a train on the New York Central track passed by, going from the city north.

As this train passed the gate-tender began to raise the east gate, and as the bars went up the team was started along under the gate to cross the tracks. As the team came upon the New York Central tracks the people in the wagon first saw a train on the Delaware, Lackawanna and Western track approaching them, coming from the city north. The gate-tender did not raise the west gate at all. He beckoned the people in the wagon to drive on across the tracks. Plaintiff was frightened and excited and he whipped up his team and drove along across the tracks. When on the Delaware, Lackawanna and Western track the train struck the wagon and the two women and the boy were killed, and plaintiff himself was more or less injured. The two trains were going in the same direction, pretty fast, and the one some rods behind the other. There was some smoke from the engine of the front train that settled down upon the track behind that train. There was a slight curve towards the east as the tracks approached the crossing from the south. The team went to and upon the tracks after the east gate was raised, slowly. The horses were gentle and manageable, the plaintiff was a good driver and was sober at the time of the accident. The people in the wagon were, to some extent, acquainted with the locality where the accident occurred. The railroad tracks all passed over a canal bridge, at a point 2,300 feet south of the crossing, towards the city. From this bridge to the crossing the tracks were built upon an embankment. There were some houses, trees, etc., obstructing the view of the tracks by persons traveling

along West Genesee street towards the crossing. But when forty-one feet easterly from the most easterly track there was an unobstructed view of the tracks south of the crossing for a distance of 714 feet, and, approaching nearer the crossing the view was extended for a further distance south, until before reaching the easterly track there was an unobstructed view of the whole 2,300 feet of tracks to the canal bridge. The bell of the engine on the Delaware, Lackawanna and Western train was ringing, as required by statute, as it approached the crossing.

*M. E. & G. W. Driscoll*, for the appellant.

*Jenney, Brooks, Marshall & Ruger*, for the respondent, Delaware, Lackawanna and Western Railroad Company.

*Hiscock, Doheny & Hiscock*, for the respondent, New York Central and Hudson River Railroad Company.

WILLIAMS, J. :

The features of this case that attract our attention, and specially require our consideration upon this appeal, are the gates and gate-tenders that were present at the accident, their acts and movements.

If these elements were absent from the case, we might very readily concur with the trial court in its disposition of it, because, although there are some features aside from these, bearing upon the question of contributory negligence, favorable to the plaintiff, such as two trains following each other so closely, the smoke from the engine attached to the first train settling down upon the tracks behind that train, and the curve in the tracks as they approached the crossing, yet it would be difficult, after considering these features, in the absence of the gates and gate-tenders, and their acts and movements, to account for these people being upon the track, in front of this train, consistently with the absence of negligence on their part.

Just where the team stood, how near the east gate when the first train passed the crossing, and when the gate-tender began to raise the bars of the east gate, does not appear; but considering that the team moved along slowly towards the tracks, from the place where it had stopped, and that it had reached the New York Central tracks before the east gate was entirely raised, and before the gate-tender had begun to raise the west gate at all, we may conclude the team

was standing near the east gate, and within forty-one feet of the east track, when the first train passed the crossing. In the absence of gates and a gate-tender, we should say it was the duty of the people in the wagon, after the first train passed by, and before the team was driven upon the tracks, to look out for any other train that might be coming upon the tracks, and if there was smoke from the first train which obstructed the view, to wait until the smoke cleared away and the view was unobstructed; and we should say, upon the evidence, if they had so looked, they would have seen the train, and, therefore, would have been guilty of negligence in going upon the tracks before it had passed by. The question, therefore, is whether the presence of the gates and gate-tender, and the action of the gate-tender in raising the bars of the east gate, so far relieved the persons in the wagon from the duty to look and listen for the approaching train as to make the question of their negligence, under the circumstances, one of fact for the jury.

In *Glushing* v. *Sharp, Receiver* (96 N. Y., 676), the plaintiff drove upon the track of the Long Island Railroad Company, in Brooklyn, his team was struck by a passing train and his horse killed and wagon injured. There were gates and a gate-tender at the crossing. As he approached the track he saw a train of cars pass and the gate-tender raise the gates and go into the gate-house. At the cross-walk, thirty feet before reaching the track, he looked and saw no train. His view was there somewhat obstructed. He did not look again, though the view for the remaining thirty feet to the track was entirely unobstructed, and if he had looked, he would have seen the train before driving upon the track. A recovery was had and was sustained by the Court of Appeals, the court saying : " The claim of the defendant is that the plaintiff should have been nonsuited on account of his own carelessness, and this claim he bases upon these facts : that at the place where the plaintiff looked, about thirty feet from the railroad track, his view was somewhat obstructed, and that he did not look again while passing the thirty feet, although during that space his view was unobstructed, and he could have seen the train if he had looked. We think the case, as to plaintiff's negligence, was properly submitted to the jury. He looked both ways, and whether, under all the circumstances, he should have looked again, or continued to look, was for the jury to determine.

The raising of the gate was a substantial assurance to him of safety, just as significant as if the gateman had beckoned to him, or invited him to come on, and that any prudent man would not be influenced by it, is against all human experience. The conduct of the gateman cannot be ignored in passing upon plaintiff's conduct, and it was properly to be considered by the jury with all the other circumstances of the case."

In *Lindeman* v. *New York Central and Hudson River Railroad Company* (42 Hun, 306), plaintiff's intestate drove a team attached to a coal wagon upon the track of defendant's railroad, in the city of Albany, and was killed. There were gates at the crossing, and at the time of the accident they were open. It was in the night, and an unobstructed view of the track could be had for seventy-three feet before reaching it. The intestate was seen, just before reaching the track, to look both ways. The engine was backing slowly towards the crossing, having no light before it. There was a nonsuit at circuit, which the General Term reversed, holding the question of contributory negligence was for the jury, saying : "The defendant insists that he could have seen the engine if he had looked, and was, therefore, negligent as a matter of law. But he had passed the place before, and, therefore, knew of the gates. He saw they were not across the road, and, as they were white, he undoubtedly saw them standing upright on each side ; as said in *Glushing* v. *Sharp* (96 N. Y., 676), this was an assurance of safety just as significant as if a gateman had beckoned to him or invited him to come on. * * * *The opening of the gates is an affirmative act, giving every traveler to know that the crossing is safe.* * * * The question of the negligence of the deceased should have gone to the jury."

The language quoted above from *Glushing* v. *Sharp* is quoted in full by Judge DANFORTH in *Woodard* v. *New York, Lake Erie and Western Railroad Company* (106 N. Y., 390). This was a dissenting opinion, but the court divided in the case, four and three. Applying the rule laid down in these cases to the present case, it seems to me the question of contributory negligence was for the jury, and that the trial court was in error in directing a nonsuit and dismissal of the complaint upon this ground. The object in having

these gates and gate-tender was to avoid collisions at this crossing between trains and persons traveling along the street with teams. The duty of the gate-tender was to have his gates down across the road-bed when trains were approaching. He was stationed at a place where he had a favorable view of the tracks; and the people in this wagon had a right to suppose, when the gate-tender raised the east gate that he intended to raise the west gate immediately after, that no trains were coming, and that teams might safely pass over the tracks at the crossing. Whether they did rely upon this act of the gate-tender, and, therefore, made a less vigilant use of their eyes than they would otherwise have done to discover whether a train was coming, and whether they were justified in so doing; whether they failed, under the circumstances, in view of the raising of the east gate by the gate-tender, to exercise such a decree of care and caution as an ordinarily careful and prudent person would have used, were questions of fact for the jury. The plaintiff testified he did look at various times while approaching the track, but did not discover the train until the team was upon the New York Central tracks. It may be doubted whether he looked very carefully, because if he did, he should have seen the train before he reached the tracks. The more reasonable conclusion, from all the circumstances, would be that these people, seeing the bars of the east gate going up, immediately after the first train passed, supposed the gate-tender was doing his duty, and that he would not raise that gate if there was any train coming, and that they relied upon the safety in crossing the tracks implied by the raising of the gate. That, therefore, without waiting for any smoke to clear away, or to obtain any very clear or satisfactory view of the tracks to the south, they started to cross over. We should hardly be willing to assume they saw the train coming, and from the first supposed they could get over ahead of it, or that the gate-tender saw the train before he raised the east gate. We rather assume that, up to the time the team reached the New York Central tracks, neither the gate-tender nor the people in the wagon had discovered the approaching train; that then they all discovered it at about the same time, all were frightened and excited, and none of them acted cooly, nor did what would have insured safety to the people in the wagon. The gate-tender could have rushed across the Delaware, Lackawanna and Western track, seized

the horses by the bits, and kept them back off the track the train was approaching on.   He could have made motions to the people in the wagon to keep back.   He did not do either of these things, upon plaintiff's evidence, but stood still, leaving the west gate down so the team could not escape, and yet motioning to the people to come along over the tracks.   So, also, the plaintiff might have stopped his team, backed them up, or turned them around, and kept them off the track, or all the people could have jumped from the wagon, and in either contingency no one would have been injured.   But, instead of doing any of these things, plaintiff, obeying the motion of the gate-tender to drive on, or misunderstanding the real motion the gate-tender made, supposing it to be a motion to come on, when, in fact, it was a motion to keep back, whipped up his horses and drove directly upon the track the train was approaching on.   If the jury found the people in the wagon were free from negligence up to the time they discovered the approaching train, when the team was upon the New York Central tracks, then when they first discovered the train they were in a place of danger, brought there by the negligence of the gate-tender, defendant's agent, and it was a question for the jury whether, in attempting to extricate themselves from this danger, being frightened and excited, and not knowing or being able to judge correctly which track the train was upon, they exercised such a degree of care and caution as an ordinarily careful and prudent person would have used.   If they did, then they were not negligent, though they entirely failed to so act, in the sudden emergency, as to insure safety.   (*Sherry* v. *N. Y. C. & H. R. R. R. Co.*, 104 N. Y., 652, 656.)

The judgment should be reversed and a new trial ordered, costs to abide event.

FOLLETT and MARTIN, JJ., concurred; HARDIN, P. J., not sitting.

Judgment reversed on the exceptions and a new trial granted, with costs to abide the event.