SOPHIA OLDENBURG et al., Administratrix, etc., Respondents, *v.* THE NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY, Appellant.

In an action to recover damages for alleged negligence causing the death of O.. plaintiffs' intestate, it appeared that O. was going south upon the west sidewalk of a city street running north and south, which is crossed by the three tracks of defendant's railroad; the space between the middle and the south track is seven feet. At the crossing there were safety-gates, which were down as O. approached. When they began to rise he went on; he could see nothing south or west as he approached the middle track, his view being obstructed by cars standing thereon, one of which reached half across the sidewalk and projected two feet beyond the rails. O. passed out from behind this car into the space between the middle and south track and was struck by the cross-beam of the tender to a locomotive on the latter, which was backing from the west; the cross-beam projected two feet beyond the track, thus leaving a space of but three feet between it and the car. O. had no knowledge of the locality; he was walking fast with his head down, the sidewalk being rough; he did not look toward the west as he passed beyond the car; the bell on the locomotive was not rung; the gateman had begun to lower the south gate, which was half-way down when the accident happened; he shouted to O. who paid no attention. *Held*, that the question of contributory negligence was properly submitted to the jury; that it could not be held, as matter of law, that O., hearing no bell and conscious of no danger, was bound to look to the west the instant he passed beyond the car; that while bound to use his eyes he was not bound to use them in a particular manner or at a particular instant of time; also that it was a question for the jury as to whether he heard the call of the gateman.

*Woodard* v. *N. Y., L. E. & W. R. R. Co.* (106 N. Y. 369); *Young* v. *N. Y., L. E. & W. R. R. Co.* (107 id. 500), distinguished.

(Argued February 24, 1891; decided March 10, 1891.)

APPEAL from judgment of the General Term of the Superior Court of the city of Buffalo, entered upon an order made October 17, 1890, which affirmed a judgment in favor of plaintiffs entered upon a verdict and denied a motion for a new trial.

This action was brought to recover damages for alleged negligence in causing the death of Charles Oldenburg, plaintiffs' intestate.

The facts are stated in the opinion.

*James F. Gluck* for appellant. It was error to submit the questions of negligence in this case to the jury. The court should have nonsuited the plaintiff or directed a verdict in favor of the defendant. (*Becht* v. *Corbin*, 92 N. Y. 670; *Biesegal* v. *N. Y. C. & H. R. R. R. Co.*, 40 id. 9; *Harty* v. *N. Y. C. & H. R. R. R. Co.*, 42 id. 468; *Cordell* v. *N. Y. C. & H. R. R. R. Co.*, 70 id. 119; *Woodard* v. *N. Y., L. E. & W. R. R. Co.*, 106 id. 369; *Young* v. *N. Y., L. E. & W. R. R. Co.*, 107 id. 500; *McDonald* v. *L. I. R. R. Co.*, 116 id. 546.) A man cannot absolutely rely upon the assumption that the defendant will perform its duty, and so relying, disregard entirely all care for his own safety. (*Ernst* v. *H. R. R. R. Co.*, 39 N. Y. 61; *Wilcox* v. *R. R. Co.*, 39 id. 358; *Grippen* v. *N. Y. C. R. R. Co.*, 40 id. 34; *Havens* v. *E. R. R. Co.*, 41 id. 296; *Young* v. *N. Y., L. E. & W. R. R. Co.*, 107 id. 500; *Palmer* v. *N. Y. C. & H. R. R. R. Co.*, 112 id. 234; *Adolph* v. *C. P. R. Co.*, 76 id. 553; *Cordell* v. *N. Y. C. & H. R. R. R. Co.*, 70 id. 119.)

*Isaac S. Signor* for respondents. There being evidence on which the jury could render their verdict, the Court of Appeals will not review it. (*Finney* v. *Gallaudet*, 30 N. Y. S. R. 194; *Greany* v. *L. I. R. R. Co.*, 101 N. Y. 420.) The evidence establishes conclusively that the defendant was negligent. (*Glusshing* v. *Sharp*, 96 N. Y. 676; *Lindeman* v. *N. Y. C. & H. R. R. R. Co.*, 3 N. Y. S. R. 731; *Callaghan* v. *D., L. & W. R. R. Co.*, 22 id. 594; *Phillips* v. *N. Y. C. & H. R. R. R. Co.*, 25 id. 91; *Feeney* v. *L. I. R. R. Co.*, 116 N. Y. 375; *Ryan* v. *N. Y. C. & H. R. R. R. Co.*, 37 Hun, 186.) It is not a case where it was necessary to plead the ordinance of the city as to speed of trains, as the action was not based on the ordinance. (*Archer* v. *N. Y. C. & H. R. R. R. Co.*, 106 N. Y. 602; *Van Radden* v. *N. Y. C. & H. R. R. R. Co.*, 30 N. Y. S. R. 300; *Dawson* v. *Sloan*, 17 J. & S. 304.)

VANN, J. Chicago street, in the city of Buffalo, runs substantially north and south, and is crossed at right angles by

three railroad tracks operated by the defendant.    The distance from the north rail of the north track to the south rail of the south track is twenty-eight feet and five inches.    Each of the tracks is four feet eight and one-half inches between the rails.    It is seven feet three and one-half inches from the south rail of the north track to the north rail of the middle track, and seven feet from the south rail of the middle track to the north rail of the south track.    There are safety gates at this crossing, fifty-one feet and six inches apart, operated by a gateman stationed at the south-west corner.    On each side of the street is a sidewalk substantially six feet wide and the distance from one sidewalk to the other is about fifty feet.    The west sidewalk between the gates is also crossed by two switch tracks, one north and the other south of the main tracks already mentioned, and extending about half way across the street before they are merged in the outer main tracks.

On the 15th of September, 1888, at about one o'clock in the afternoon, Charles Oldenburg, the plaintiffs' intestate, a man of mature years, was walking south on the west side of Chicago street, and as he approached this crossing, the gates were down to enable a passenger train of four or five coaches to pass toward the west on the north track.    He stopped until the last car had crossed, and as the gates began to rise, he went on. At the same time a team started to cross from the south, the gateman having shouted to it to go ahead.    It went very slowly. Until Oldenburg had passed over the middle track, he could see nothing south thereof and west of the sidewalk on which he was walking, because his view in that direction was cut off by fifteen passenger coaches standing on the middle track and extending westward for a block and a half.    The most easterly of these coaches reached half way across the west sidewalk and projected two feet beyond the rails of the track upon either side.    Thus his view to the south-west was shut off until he had passed by the end of the coach, which would place him at a point two feet south of the middle track. Until he reached this point, which was only five feet from the south track, he could see substantially no part of that track

west of the sidewalk. As he reached this point, walking rather fast and having no knowledge of the locality, a locomotive with a tender attached was almost upon him, backing eastwardly on the south track at the rate of ten miles an hour. The bell was probably ringing, but the passenger train was not out of hearing and there was some confusion of sounds. Had he stopped and looked toward the west at the instant that he reached the said point, he could have seen the danger in time to avoid it, but less than two steps forward brought him in contact with the cross-beam of the tender, which projected about two feet beyond the rails of the track on each side, and he was thrown under the wheels and killed. He did not look toward the west at the critical moment when he could have seen the engine, but went with his head down, as if looking at the sidewalk, which was rough, and the planks composing it very uneven. The gateman had begun to lower the south gate, and it was half way down when the accident happened. As he was lowering the gate, he shouted to the deceased who paid no attention, and whether he heard or not was a question of fact, under the circumstances. The space between the middle and south tracks, where Oldenburg could have stood without danger from the passenger coach behind or the advancing tender in front, was only three feet long. In order to reverse this judgment, it is necessary to hold that, notwithstanding the peculiar facts surrounding him, he was bound, as matter of law, while passing over this distance of three feet, to look to the west so as to see the engine, or else to look in front of him and up high enough to see the gate as it began to fall. We do not think that the law required this, but agree with the courts below in holding that the question of contributory negligence, under all the circumstances, was one of fact for the jury and not of law for the court.

The deceased did not enter upon the crossing until the flagman had not only given a signal of safety by raising the gates, but had also shouted to the team in waiting to go ahead. Whether he heard the shout or not, the open gate was virtually an invitation to him to proceed and the team crossing slowly

was in plain sight and would naturally add to his confidence. As said by this court in a recent case : " The raising of the gate was a substantial assurance to him of safety, just as significant as if the gateman had beckoned to him or invited him to come on, and that any prudent man would not be influenced by it is against all human experience." (*Glushing* v. *Sharp*, 96 N. Y. 676.) Or, as laid down in a still later case : " The open gate was an affirmative and explicit declaration and representation that neither train nor locomotive was approaching with intent to pass." (*Palmer* v. *N. Y. C. & H. R. R. R. Co.*, 112 N. Y. 234, 241.)

While the deceased had the right to rely to a certain extent upon the assurance thus given by the defendant that it was safe for him to go on, it was still his duty to be on the lookout for danger, and to exercise the same care that a man of ordinary prudence would have exercised under the same circumstances. The degree of care depended upon his knowledge of the situation, or upon those facts that he would have discovered by the use of ordinary vigilance. It does not appear that he had ever seen this crossing before, or that he knew anything about it, except what he observed on the occasion when he met his death. In this respect, as well as by the implied invitation to proceed arising from the use of safety gates, this case is easily distinguished from those relied upon by the defendant. (*Woodard* v. *N. Y., L. E. & W. R. R. Co.*, 106 N. Y. 369 ; *Young* v. *N. Y., L. E. & W. R. R. Co.*, 107 id. 500.)

It is claimed that he should have looked to the right, so as to see the approaching engine, and in front, so as to see the descending gate, but can it be held as matter of law that he had time for this, and also to use due care in other respects ? According to the evidence, not more than nine or ten seconds elapsed after the passenger train had gone by on the north track before the engine came down on the south track. During this short period he proceeded to cross, passed over two tracks, reached the third where he could not safely stop, because at any time the passenger coaches standing there

might back down upon him, went on two feet further, where the strip three feet long would have afforded safety if he had known it, took one step more, and in the language of a witness, "just as he gave the second step he was whirled around and pitched headforemost." . Can the court say that, knowing nothing of his surroundings, he was bound to look in any particular direction while, hearing no bell and conscious of no danger, he took one step and a part of another? How long is a rapid walker in taking a single step? How much time was there for reflection or action? Even if he had stopped walking, how could he have decided on the instant just where it was safe for him to stand between the tracks? It was his privilege to look down upon the rough walk so as to avoid danger there, and the evidence warranted the jury in finding that he did so. It was his duty to look to the east where there was no obstruction in sight, but while he was bound to use his eyes, we cannot say that he was bound to use them in a particular manner, at a particular instant of time. We think that it was for the jury to take into consideration all the circumstances and decide whether he exercised such care as could reasonably be required of one in his situation and with his knowledge. (*Greany* v. *Long Island R. R. Co.*, 101 N. Y. 419; *Sherry* v. *New York Central, etc., R. R. Co.*, 104 id. 652, 657.)

As this is the only question, properly raised by exception, that has been discussed by the learned counsel for the defendant, the judgment should be affirmed with costs.

All concur.

Judgment affirmed.