JULIA TORRES VDA. DE RODRÍGUEZ, demandante y apelada, *v.*
THE AMERICAN RAILROAD CO. OF PORTO RICO Y VICTORIA
TIRADO VDA. DE RODRÍGUEZ, demandadas y apelante la pri-
mera.

No. 2969.—*Visto:* Mayo 24, 1923. *Resuelto:* Agosto 1, 1925.

1. FERROCARRILES—EXPLOTACIÓN *(Operation)*—ACCIDENTES EN LOS CRUCES—AC-
CIÓN DE DAÑOS Y PERJUICIOS POR MUERTE—DEMANDA—SUFICIENCIA DE LA
MISMA.—Examinada la demanda en el caso de autos—acción de indemniza-
ción de daños y perjuicios por muerte—*se resolvió:* que aducía hechos sufi-
cientes para determinar una causa de acción contra la demandada.

2. APELACIÓN Y ERROR—PRESENTACIÓN Y RESERVA EN LA CORTE INFERIOR DE LOS
FUNDAMENTOS DE REVISIÓN—OBJECIONES A LAS ALEGACIONES—INSUFICIENCIA
DE LA DEMANDA.—Aceptando, sin resolver, que una alegación en la demanda
—en acción de indemnización de daños y perjuicios por muerte—referente
al derecho exclusivo de la madre y viuda como únicas herederas del difunto
es una conclusión de derecho, el demandado no puede, a falta de razona-
miento o cita de autoridades, descansar en tal defecto, al ser notado por
primera vez en apelación, como una omisión fatal de un elemento esencial
para la causa de acción.

3. JUECES—DERECHOS, FACULTADES, DEBERES Y RESPONSABILIDADES—ACTUACIONES
FUERA DEL LÍMITE TERRITORIAL DE SU JURISDICCIÓN.—Una sentencia que ha
sido debidamente registrada es válida, mientras no se demuestre lo contrario,
a pesar de haber sido firmada en un distrito distinto a aquel en que la
causa se vió.

4. APELACIÓN Y ERROR — REVISIÓN — ERRORES NO PERJUDICIALES — ADMISIÓN DE
PRUEBA OBJETADA—PRUEBA ADMISIBLE BAJO LAS ALEGACIONES.—No consti-
tuye error de una corte el permitir declarar sobre las causas que pueden
ocasionar el corte de una máquina y los vagones y frenos de un tren, cuando
la declaración está en consonancia con las alegaciones de la demanda, respecto
a la condición de la vía, y menos aún cuando la corte inferior circunscribe
esa evidencia como tendente a demostrar las causas que originaron la separa-
ción de la locomotora del resto del tren por culpa del maquinista, y esta
conducta, más que la alegada negligencia en el mantenimiento de la vía, se
alega como razón principal de la decisión a favor del demandante.

5. APELACIÓN Y ERROR — REVISIÓN — ERRORES NO PERJUDICIALES — ADMISIÓN DE
PRUEBA OBJETADA—PRUEBA QUE, AUNQUE IMPROPIA E INADMISIBLE, PUEDE
HABERSE CONSIDERADO POR LA CORTE POR RAZONES ESPECIALES.—No consti-
tuye error perjudicial la admisión de prueba, no obstante objeción, cuando
por impropia o inadmisible que fuera, puede haber sido considerada por la
corte inferior por razones de política pública o por motivos que no se ale-
garon en el pleito.

6. APELACIÓN Y ERROR — REVISIÓN — ERRORES NO PERJUDICIALES — ADMISIÓN DE
PRUEBA OBJETADA—PRUEBA QUE NO AFECTA EL RESULTADO DEL CASO.—No es
error perjudicial la admisión de prueba, no obstante objeción, cuando exa-
minados los hechos del caso, se está convencido que el resultado en la corte
inferior no hubiera sido diferente aún cuando la objeción hubiera sido
sostenida.

7. FERROCARRILES—EXPLOTACIÓN *(Operation)*—ACCIDENTES EN LOS CRUCES—ACCIÓN DE DAÑOS Y PERJUICIOS POR MUERTE—CUESTIONES PARA LA CORTE INFERIOR—CUESTIÓN DE NEGLIGENCIA CONTRIBUTORIA.—La cuestión de negligencia contributoria *vel non,* según las circunstancias que pueden o nó excusar tal negligencia, debe dejarse a la consideración de la corte inferior.

8. APELACIÓN Y ERROR—REVISIÓN—ALCANCE Y EXTENSIÓN EN GENERAL—CUESTIONES NO LEVANTADAS NI DISCUTIDAS POR EL APELANTE.—Al Tribunal Supremo no corresponde investigar y resolver, de su propia iniciativa, cuestiones que, además de ser más o menos dudosas, no han sido levantadas ni discutidas por el apelante.

9. FERROCARRILES—EXPLOTACIÓN *(Operation)*—ACCIDENTES EN LOS CRUCES—ACCIÓN DE DAÑOS Y PERJUICIOS POR MUERTE—DAÑOS Y PERJUICIOS—MEDIDA DE LOS DAÑOS.—En una acción sobre indemnización de daños y perjuicios ejercitada por un padre o madre por la muerte de su hijo adulto, la más corta esperanza de vida del demandante debe tomarse en consideración al determinar la cuantía de los daños y perjuicios.

10. FERROCARRILES—EXPLOTACIÓN *(Operation)*—ACCIDENTES EN LOS CRUCES—ACCIÓN DE DAÑOS Y PERJUICIOS POR MUERTE—APELACIÓN—RESOLUCIÓN Y DISPOSICIÓN DEL CASO—DISMINUCIÓN DE LA CANTIDAD ADJUDICADA POR SENTENCIA.—Atendidas las circunstancias concurrentes en el caso de autos y la esperanza de vida de la demandante, *se resolvió:* que la cantidad concedida por la corte inferior como daños y perjuicios—$2,600 más costas—era mayor de lo que las mismas justificaban, y que la cantidad de $1,500, intereses y costas, era un cálculo conservador y razonable.

SENTENCIA de *Tomás Bryan,* J. (Mayagüez), declarando con lugar la demanda, con costas. *Modificada y confirmada.*

*Mariano Acosta Velarde,* abogado de la apelante; *Juan Alemañy Sosa,* abogado de la apelada.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del tribunal.

[1, 2] Insiste la apelante en que la demanda no aduce hechos suficientes para constituir una causa de acción contra la demandada por no alegar que la estación del ferrocarril en cuestión pertenecía a la demandada, ni que el billete comprado por el hijo de la demandante fué vendido por la demandada; ni que el hijo de la demandante usó algún cruce público o cualquier otro cruce por donde tenía derecho a ir por la vía o donde la demandada tenía alguna obligación o deber para con él; ni que el referido hijo carecía de descendientes a la fecha de su muerte; sino que, por el contrario, expresa la apelante, de la demanda sí parece que hubo negligencia contributoria por parte de la alegada víctima de la

negligencia de la demandada.  En la demanda se alega lo
lo siguiente:

"I. Que The American Railroad Co. of Porto Rico, es una cor-
poración constituída e incorporada de acuerdo con las leyes de Puerto
Rico, y en las fechas que más adelante se dirán explotaba un Fe-
rrocarril junto con las líneas, carriles, máquinas, propiedades, ma-
terial rodante y otras pertenencias, conocidos con el nombre de The
American Railroad Co. of Porto Rico; y se dedicaba al transporte
de carga y pasajeros entre San Juan y Ponce, pasando por Lajas.

"II. Que el día 2 de noviembre de 1920, a las tres de la tarde
poco más o menos, se encontraba en el andén de la Estación del Fe-
rrocarril en el pueblo de Lajas, y sus alrededores, entre otras per-
sonas, Pedro Rodríguez, esperando el tren correo que le correspon-
día pasar por allí a la expresada hora, para ocuparlo y usarlo como
pasajeros, y que había comprado un ticket para que el tren lo con-
dujera desde la Estación del pueblo de Lajas a la de Lajas Arriba.

"III. Que por no caber en la Estación, por ser ésta excesiva-
mente pequeña y encontrarse completamente llena de gente, el ex-
presado Pedro Rodríguez esperaba el tren parado en la prolongación
de la calle de la Victoria, al lado Este de la vía.

"IV. Que debido exclusivamente al descuido, culpa y negligen-
cia de la demandada The American Railroad Co. of Porto Rico, en
la conservación, sostenimiento y cuidado de las vías de su Ferro-
carril y en el manejo y manipulación de las máquinas del mismo, el
expresado día dos de noviembre de 1920, la máquina del tren correo,
que pasa todos los días por la Estación de Lajas a las tres de la
tarde, que estaba guiada, conducida y manipulada por empleados
de la demandada The American Railroad Co. of Porto Rico, se des-
conectó de los vagones del tren en la travesía de San Germán a La-
jas; y que así desconectada dicha máquina y los expresados vago-
nes continuaron su marcha independientemente una de los otros, a
una velocidad excesiva ambos, yendo la máquina delante de los va-
gones a una distancia considerable; y que cuando dicha máquina
fué a llegar a la Estación de Lajas pitó como de costumbre y pasó
por allí a gran velocidad, pero sin dar aviso alguno de alarma; y
que esto produjo en dicho Pedro Rodríguez la creencia de que el
tren no pasaría en buen rato y dió lugar a que, por tales circuns-
tancias, el expresado Pedro Rodríguez cruzase del sitio en que se
encontraba, esperando el tren, al otro lado de la vía para unirse
con otros compañeros, gritando que se había comido un pavo, y que
en este momento los vagones del tren correo, que se habían desco-

nectado de dicha máquina y venían detrás de ella a una gran veloci-
dad, negligentemente pasaron por dicha Estación del pueblo de La-
jas, sin dar aviso alguno, y arrollaron al expresado Pedro Rodrí-
guez, que cruzaba la vía en aquel momento, como se ha dicho, y lo
tiraron al suelo, destrozándole las piernas y el cráneo y matándolo
instantáneamente; todo ello debido a la culpa y negligencia de la
demandada The American Railroad Co. of Porto Rico; y cuando el
expresado Pedro Rodríguez observaba todo el cuidado y diligencia
necesaria en sus actos, obras y acciones mientras esperaba el tren
en la Estación de Lajas.

V. Que dicho Pedro Rodríguez, a la fecha de su muerte era un
hombre como de treinta y un años de edad, saludable y robusto, de
un peso de ciento cuarenta a ciento cincuenta libras; que se dedi-
caba al cultivo de la tierra en cuyo trabajo ganaba un promedio de
doce dólares semanales; y que tenía un término prudencial de vida
de veinticinco años más en aptitud de poder trabajar en iguales con-
diciones que el presente.

VI. Que la demandante es madre legítima del expresado finado
Pedro Rodríguez, en cuya compañía vivía desde que quedó viuda,
atendiendo él con el producto de su trabajo a todas las necesidades
de la demandante y dependiendo ésta en absoluto para su sosteni-
miento del trabajo de su expresado hijo.

VII. Que las únicas personas con derecho a la herencia o suce-
sión de dicho finado son su madre legítima, la demandante, y su
viuda doña Victoria Tirado, viuda de Rodríguez, a la que se hace
demandada por no haberse podido obtener su consentimiento para
asociarse como demandante en la presente acción.

VIII. Que por la culpa y negligencia de la demandada The
American Railroad Co. of Porto Rico, que ocasionó la muerte del
expresado hijo de la demandante, Pedro Rodríguez, la demandante
ha sufrido daños y perjuicios consistentes en servicios dejados de
obtener de su expresado hijo, de cuyo trabajo dependía exclusiva-
mente para su asistencia, ascendentes a dos mil novecientos dollars
($2,900).

Podemos aceptar para los fines del argumento, aunque
sin resolver, que la alegación referente al derecho exclusivo
de la madre y viuda como únicas herederas del interfecto
es una conclusión de derecho. Pero no queremos asumir
con la apelante, a falta de algún razonamiento o cita de au-
toridades, que podía descansar con éxito en tal defecto al

ser notado por primera vez en apelación como una omisión fatal de un elemento esencial para la causa de acción.

Las otras omisiones que enumera el abogado de la apelante en tanto no estén necesariamente envueltas o se infieran razonablemente del texto, o estén subsanadas por la prueba aducida al juicio apenas puede decirse que constituyen una falta absoluta en determinar una causa de acción.

Los hechos referidos en el cuarto párrafo arriba citado de la demanda son bastantes para refutar, explicar y excusar lo que de otro modo podría considerarse como negligencia contributoria por parte de Pedro Rodríguez. *Conley's Administratix* v. *Cincinnati, New Orleans and Texas Pac. Ry. Co.*, 89 Ky. 402, 12 S. W. 764; Police Law of Railroads, secciones 77 a la 80 inclusive, y 88; *Patton* v. *East Tennessee Railroad Co.*, 89 Tenn. 370, 15 S. W. 919, 12 R.C.L. 184; 20 R.C.L. p. 117, sección 101; II Thompson sobre Negligencia, 412, sección 1717.

[3] Se sugiere también que:

"2. La corte erró al dictar sentencia contra la apelante porque carecía de jurisdicción por cuanto la sentencia fué dictada en cámara fuera del distrito judicial de Mayagüez, y con más de noventa días después de celebrado el juicio del caso y de estar sometido el mismo a la consideración de la corte."

La sentencia demuestra por su faz haber sido dictada "en Aguadilla para Mayagüez", en marzo 21; está firmada por Tomás Bryan "Juez de la Corte de Distrito de Aguadilla y Juez Especial en este caso en la Corte de Distrito de Mayagüez". Está autenticada por el secretario de la corte de distrito de Mayagüez y certificada por él como la "sentencia registrada el día 23 de marzo de 1922, en la página 114 del Libro N del Registro de Sentencias de la Corte de Distrito del Distrito Judicial de Mayagüez."

Hay poco o ningún razonamiento y menos discusión o análisis de las autoridades citadas en apoyo del segundo señalamiento que la apelante funda en la regla general y prin-

cipio enunciado en los extractos de, o por simple referencia a los artículos 21 y 22 del Código de Enjuiciamiento Civil; "Ley No. 25 promulgada en marzo 31, 1919"; *Marvin & Jones* v. *Torres,* 19 D.P.R. 48; Estee's Practice and Pleading, sección 29; *Wicks* v. *Ludwig,* 9 Cal. 173; Black on Judgments, tomo 1, sección 177, páginas 259, 361, sección 243; 23 Cyc. 550, 677, 563, 675 y 782; *Sawyer* v. *Hunning,* 181 Pac. 172; *McIntyre* v. *Northern Pac. Ry. Co.,* 191 Pac. 1065; 15 R.C.L. p. 610, sección 51.

Dentro de las circunstancias y sin cerrar las puertas a una ulterior investigación en futuros casos, será bastante por ahora con hacer referencia de paso al caso de *Oronoz* v. *Román,* 26 D.P.R. 25, citado también por la apelante, y al tomo 14 de la Jurisprudencia de California, páginas 914, 916, sección 33.

[4] Otra alegación es que:

"3. La corte incurrió en manifiesto error al permitir, con la objeción de la demandada, que el testigo de la demandante Ricardo Andrades declarase en cuanto a lo que ocasionó el corte de la máquina y los vagones; sobre frenos y topes."

El testigo Andrades era un guardafrenos y práctico con una experiencia de quince años adquirida como empleado de la demandada. Levantada la objeción de que no se preguntara en cuanto a la condición de los topes, ésta fué prontamente desestimada. En contestación a otra pregunta respecto a la clase de frenos que usaba el tren se permitió al testigo solamente dar el nombre de "Westinghouse." La sola otra pregunta a la que se hizo objeción en debida forma y a la cual siguió una excepción a la resolución de la corte fué en cuanto a qué podría causar el corte de la máquina y vagones de frenos Westinghouse. La contestación desprovista de detalles explicativos y en tanto debe ser considerada aquí fué en substancia que los frenos nada tienen que ver con el corte del tren.

La esencia del razonamiento de la apelante parece ser que

la demanda no contiene ninguna alegación sobre la condición de los frenos, y la única autoridad que se cita es el caso de *De Sola* v. *Kansas City Railway Co.,* 27 S. W. 675, al efecto de que cuando se alega la negligencia en el manejo de carros como base de una acción, es inadmisible la prueba para demostrar los defectos en los frenos.

Pero la declaración del testigo Andrades, en tanto fué considerada por la corte inferior estaba en consonancia con las alegaciones específicas de la demanda, supra, respecto a la condición en que estaba atendida la vía, cuestión innecesaria, según parece, a la causa de acción de la demandante, la que tal vez pudo haberse eliminado por ser demasiado remota mediante una moción de la demandada, si alguna cuestión como ésta se hubiera levantado en la corte inferior. Pero tal moción no se hizo.

El juez sentenciador en sus conclusiones de hecho circunscribe esta evidencia como tendente a demostrar la causa de las dificultades que originaron la consciente separación de la locomotora y el alijo del resto del tren por culpa del maquinista más que a indicar la causa próxima del mismo accidente y esta conducta por parte del maquinista unida a otros actos del fogonero, ya fueran ejecutados de acuerdo con o en violación de órdenes dadas por el maquinista, más que la alegada negligencia en el mantenimiento de la vía, se alega como razón principal de la decisión en favor de la demandante.

[5, 6] El cuarto señalamiento levanta una cuestión que es algo más seria, a saber:

"4. La corte incurrió en manifiesto error al admitir como evidencia, con objeción de la demandada, prueba de que el maquinista que manipulaba el tren, que se alega arrollara al causante de la demandante, fuese castigado por la demandada apelante."

Aquí también sólo se cita un caso en el alegato, a saber, el de *Christensen* v. *Union Trunk Line,* 32 Pac. pág. 1018, si bien en la vista se hizo mención de otros dos o sean los de

*Engel* v. *United Traction Co.*, 203 N. Y., pág. 321, y *Guillett* v. *Shaw*, 217 Mass., 59; 104 N.E. 719.

En el caso de Christensen la Corte Suprema de Washington, sin razonar o citar autoridades, se expresó así:

"También somos de opinión de que la corte no debió haber permitido al demandado probar que el conductor del carro fué separado de su empleo por el apelante pronto después de ocurrir el accidente; pero, toda vez que también se demostró que era la práctica de la compañía despedir a todos los motoristas a quienes les ocurriera accidentes bajo cualesquiera circunstancias, creemos que la resolución no fué suficientemente perjudicial para dar derecho al apelante a la revocación de la sentencia por ese fundamento."

El caso de *New York* habla por sí mismo.

La expresión incidental (*dictum*) del caso de *Guillet* v. *Shaw* es que:

"la prueba en la deposición del chauffeur Dykeman de que fué separado de su empleo dos días después del accidente no era pertinente como una admisión implícita por el demandado de que el chauffeur había sido descuidado. *Hewitt* v. *Taunton Street Railway*, 167 Mass. 483."

En el caso de *Hewitt* la corte de *Massachusetts* dijo lo siguiente:

"Hasta ahora se ha sostenido que el tomar precauciones adicionales después de un accidente para evitar otros no es admisible en un caso como éste con el fin de probar la negligencia. Shinners v. Propriètors of Locks & Canals, 154 Mass. 168. Downey v. Sawyer, 157 Mass. 418. Columbia & Puget Sound Railroad v. Hawthorne, 144 U. S. 202. Las mismas razones que dieron lugar a aquellas decisiones son aplicables al presente caso. Sostener otra cosa tendería a desalentar la adopción de salvaguardias adicionales mejorando la calidad y levantando la norma del servicio."

Si debemos o nó adoptar la misma regla en esta jurisdicción es asunto que puede quedar abierto a discusión hasta que la cuestión haya sido presentada más concretamente y resuelta por una corte de distrito y más debidamente desarrollada en los alegatos en apelación.

En el presente caso la única objeción que se hizo en el juicio fué que la prueba era "enteramente inmaterial" sin hacerse ninguna manifestación de por qué se consideró por el abogado como inmaterial, ni ninguna especificación en cuanto al fundamento de la excepción tomada a la orden de la corte. La objeción así interpuesta no se hizo sino una vez al empezar la pregunta de si la compañía había "hecho alguna cosa con el maquinista." Dentro de las circunstancias, el juez sentenciador puede haber procedido en la suposición de que la pertinencia de la acción si la hubo, establecida por la demandada, dependería de si tal acción se fundaba en la creencia por parte de la demandada de que el maquinista había sido culpable de verdadera mala conducta o negligencia al ordenar la separación de la máquina y el alijo del resto del tren, o era de otro modo en realidad responsable del accidente, en cuyo caso la conclusión natural sería que la cuestión podía resolverse más tarde. Pero la objeción no fué renovada, no se llamó la atención a la corte sentenciadora en ningún momento acerca de la verdadera base para solicitar la exclusión de tal prueba, asumiendo en pro del argumento que debió haber sido excluido.

La materia objeto de la pregunta no era por necesidad "enteramente inmaterial", por impropia o inadmisible que como campo de investigación pudiera haber sido considerada por razones de política pública o por otros motivos que no se alegaron en el juicio. 1 Wigmore, 577, sección 283.

Además, aunque la suspensión temporal de empleo y rebaja en categoría se menciona en las conclusiones de la corte inferior, dicha corte no funda su razonamiento sobre la negligencia del maquinista exclusivamente, ni siquiera principalmente en ninguna admisión implícita de la demandada, sino, según parece, en las declaraciones terminantes de testigos oculares corroboradas por hechos materiales establecidos por la prueba en conjunto y en particular, por la inspección ocular del sitio del suceso, robustecida más bien que debilitada por el mismo relato vago, incoherente y contradic-

torio hecho por el maquinista, del incidente y su relación activa con el mismo. Verdaderamente que de un examen cuidadoso de los hechos y conclusiones en conjunto estamos enteramente convencidos de que el resultado en la corte inferior no hubiera sido diferente aun cuando la demandada hubiera alegado un fundamento de objeción más sostenible y si la objeción así formulada hubiera sido sostenida.

La quinta proposición es la siguiente:

"5. La corte incurrió en manifiesto error al declarar probado y dictar sentencia por el fundamento de que Pedro Rodríguez era un pasajero de la demandada apelante."

Para fines del momento podemos admitir con la apelante que Pedro Rodríguez en el preciso momento de ocurrir su muerte no tenía derecho a esperar o exigir un grado extraordinario de cuidado o protección contra el peligro por la relación de pasajero y porteador. Aparte de esto el quinto señalamiento como ha sido presentado y sometido en el alegato de la apelante no requiere seria consideración.

Con el fin de que la corte inferior pueda hablar por sí y no por un intérprete, y para mejor entendimiento de la verdadera importancia de los subsiguientes señalamientos sobre los méritos del presente caso, nos vemos obligados, aun a riesgo de una improcedencia aparente, a citar ampliamente las conclusiones de hecho y de derecho emitidas por el juez sentenciador, a saber:

"De la prueba introducida la corte encuentra probado que la demandada The American Railroad Co. of Porto Rico es una corporación autorizada para hacer negocios en esta Isla, y lo era el día 2 de noviembre de 1920; que se dedica a la explotación de un ferrocarril para el transporte de carga y pasajeros entre varios puntos de Puerto Rico y que pasa por el pueblo de Lajas; que el día 2 de noviembre de 1920 se celebraron en la Isla de Puerto Rico las elecciones generales, con cuyo motivo la afluencia de gente de los campos a pueblos y sitios tuvo lugar como en ningún otro día; que el tren correo que diariamente hace la travesía de San Juan a Ponce pasa por el pueblo de Lajas tanto ahora como en la fecha antes di-

cha, a las tres de la tarde, poco más o menos; que el día 2 de no-
viembre de 1920, como a las tres de la tarde, poco más o menos, se
encontraba parado en el andén de la estación que la demandada,
The American Railroad Co. of Porto Rico, tiene en el pueblo de
Lajas, un número suficiente de personas hasta llenar dicha estación,
que tiene cabida para cuarenta o cincuenta personas, y alrededor
de dicha estación y frente a la misma hasta la esquina de la calle
'Victoria', se encontraban como 300 personas más, casi todas las
cuales esperaban el tren que a dicha hora tenía que pasar por la ex-
presada estación a fin de trasladarse a sus respectivos hogares en di-
ferentes barrios en el pueblo de Lajas de donde habían venido aquel
día con motivo de las elecciones; que entre los que se encontraban
esperando el tren en aquel sitio y a aquella hora frente a la esta-
ción, al otro lado de la vía hacia la esquina de la calle de la 'Vic-
toria' figuraba un hombre llamado Pedro Rodríguez, de poco más
de 30 años de edad, de constitución robusta, que se dedicaba al cul-
tivo de la tierra y a las faenas del campo, para el cual se había com-
prado y se había entregado un ticket o billete para ser conducido
por el tren desde la plaza del pueblo de Lajas, donde lo esperaba,
hasta la de Lajas Arriba; que a la hora de costumbre o sea las
tres de la tarde, poco más o menos, las personas que se encontraban
reunidas en la estación oyeron el pito de la máquina del tren co-
rreo, que anunciaba, como de ordinario, la llegada del tren; que
dichas personas, entre ellas Pedro Rodríguez, se prepararon y dis-
pusieron a tomar el tren, unas por un lado y otras por el otro lado
de la vía; que al poco rato de oirse el pito la expresada máquina
pasó frente a dicha estación pero sin detenerse en ella, yendo a
gran velocidad, sola, sin arrastrar vagones o carros de ninguna es-
pecie, estando la vía completamente limpia y todas las personas que
esperaban el tren en sitios de seguridad; que con motivo del paso
de dicha máquina por la estación en las expresadas condiciones, di-
chas personas que se encontraban allí prorrumpieron en gritos de
viva a los partidos políticos y otros de que se habían comido un pavo
porque aquella máquina no era la del tren correo que ellos estaban
esperando; que las personas allí reunidas, entre ellas Pedro Rodrí-
gues, tuvieron la creencia razonable de que el tren correo o tren otro
alguno, no pasaría entonces por allí y que ninguno estaba próximo,
en cuya consecuencia procedieron a retirarse de la estación para el
pueblo, teniendo para ello que cruzar la vía los que se encontraban
en la parte opuesta de ella en relación con el edificio de la estación
y el pueblo; que en el momento en que en estas circunstancias dicho
Pedro Rodríguez cruzaba la vía en dirección al pueblo gritando que

se había comido un pavo fué arrollado y muerto por los vagones de dicho tren correo que se habían cortado y desprendido de la máquina mucho antes de llegar a la estación y que sin aviso ni señal alguna, cuando no existía razón ni causa alguna para que dicho Pedro Rodríguez, o persona otra alguna de las allí reunidas, presumiese su proximidad o posibilidad de pasar por allí, debido a una curva en la vía que llegó hasta casi frente a la misma estación, aparecieron de súbito y cruzaron y pasaron frente a dicha estación; que aquel mismo día después de la salida del tren correo de la ciudad de San Germán para cruzar por Lajas, los pasajeros empezaron a sentir fuertes topetazos, choques fuertes, hasta que el maquinista, al bajar una pendiente entre San Germán y Lajas, detuvo el tren, encontró los topes atravancados, ordenó descargar el tren por el 'tender' y que el fogonero, que estaba en la máquina hiciera caminar ésta para separarla de los carros y que el tren quedara parado, pero como estaba en una pendiente, una vez separada la máquina del tren, estando éste descargado, corrió detrás de la máquina, el fogonero cogió miedo y partió en la máquina delante del tren a gran velocidad, el maquinista tuvo que ocupar el tren, que siguió detrás de la máquina, y en estas condiciones pasaron por la estación de Lajas; que el mal estado de conservación de la vía de la demandada fué la causa de los golpes y choques y desencaje de los topes que tuviera el tren antes de su corte, y que éste, o separación de la máquina y el tren se debió a la naturaleza de la forma de manejar, dirigir, maniobrar y manipular dicho tren por los empleados de la demandada, The American Railroad Co. of Porto Rico; que ésta castigó al maquinista Santana de dicho tren por la expresada causa, con degradación y separación temporal de empleo y sueldo, que el expresado Pedro Rodríguez, a la época de su fallecimiento, o sea el 2 de noviembre, 1920, tenía como únicos universales herederos a su legítima madre la demandante, Julia Torres, viuda de Rodríguez, y a su esposa la demandada Victoria Tirado, Vda. de Rodríguez, en la proporción correspondiente de acuerdo con la ley; y que el expresado Pedro Rodríguez satisfacía todas las necesidades de su madre la demandante con el producto de su trabajo, del cual dependía ésta exclusivamente para su vida y sostenimiento.

"De estas conclusiones de hecho, la corte llega a la conclusión de derecho de que la demandada, la American Railroad Co., fué descuidada y negligente en el uso, atención y conservación de su vía extendida entre la ciudad de San Germán y el pueblo de Lajas, en la expresada fecha, permitiendo que dicha vía tuviera golpes que ocasionara los choques del tren y que se atravancaran los topes; y

que asimismo fué negligente dicha demandada en el manejo, dirección y manipulación de su expresado tren correo en el trayecto comprendido entre la ciudad de San Germán y el pueblo de Lajas, el día 2 de noviembre de 1920, a cuya consecuencia se partió o dividió el tren en dos y continuó así dividido y descuidada y negligentemente, al pasar los vagones de dicho tren por la estación del pueblo de Lajas, arrollaron y mataron al expresado Pedro Rodríguez; que la causa próxima e inmediata de este accidente que ocasionó la muerte al susodicho Pedro Rodríguez fué la culpa, abondono y negligencia de la demandada The American Railroad Co. of Porto Rico, en la atención, uso y conservación de la expresada vía y en la dirección, manejo y manipulación de su tren.

"En cuanto a la alegación de negligencia contributoria hecha por la demandada la American Railroad Co. of Porto Rico, la corte llegó a la conclusión de que en las circunstancias en que dicho Pedro Rodríguez cruzó la vía en el momento en que fué arrollado y muerto por la demandada, no cometió ninguna negligencia ni era un transgresor ni un 'licensee'; a este respecto la corte cita a Sherman & Redfield sobre Negligencia, tomo 2, pág. 1466, sec. 525 y casos anotados, para demostrar la falta de negligencia contributoria, y en cuanto a las relaciones existentes entre dicho Pedro Rodríguez y la demandada, The American Railroad Co. of Porto Rico, en el momento de la muerte de aquél, la corte cita el mismo tomo de la obra, seciones 488 y 490, págs. 1297 y 1307."

Los señalamientos de error que no han sido ya discutidos son los siguientes:

"6. La corte incurrió en manifiesto error, al dictar sentencia contra la demandada, por el fundamento, de que la demandada fué negligente en el manejo y manipulación de sus trenes y en el mantenimiento y conservación de su vía.

"7. La corte incurrió en manifiesto errror al dictar sentencia contra la demandada por el fundamento de que la demandada fué negligente en el manejo y manipulación de sus trenes y en el mantenimiento y conservación de su vía y que éste fué la causa próxima e inmediata del arrollamiento y muerte del Pedro Rodríguez.

"8. La corte incurrió en manifiesto error al declarar que el interfecto Pedro Rodríguez no fué culpable de negligencia contributoria, y que ésta no fué la causa próxima e inmediata del accidente.

"9. La corte incurrió en manifiesto error al dictar sentencia a favor de la demandante porque según el peso y preponderancia de

la prueba la demandada no fué culpable de negligencia ni de la causa próxima del accidente y según el claro peso de la prueba el interfecto Pedro Rodríguez fué culpable de negligencia contributoria, siendo esto la causa próxima de su muerte.

"10. La corte incurrió en manifiesto error al dictar sentencia contra la demandada condenándole a pagar a la demandanate la suma de $2,600 más las costas de esta acción e intereses."

[7] No creemos necesario seguir al abogado de la apelante en la discusión de todos los casos citados para sostener los señalamientos sexto al noveno inclusive ni iniciar un debate sobre las proposiciones legales y abstractas anunciadas en las citas hechas en el alegato.

Las facilidades de investigación y busca en algunos de los distritos adyacentes parecen ser bastante limitadas; y puede admitirse que la cita de Sherman y Redfield dejan mucho que desear en apoyo de las conclusiones a que llega la corte inferior. La frecuencia con que dicha obra se cita en el alegato de la apelada y el escaso número de autoridades parece indicar que el juez sentenciador no tuvo la ventaja de un amplio campo de selección. Dentro de las circunstancias el resultado en la corte inferior es quizás más o menos un buen ejemplo de confianza de un sano instinto judicial como norma adecuada a falta de un gran número de casos resueltos en otras jurisdicciones.

. La que más se acerca al presente caso entre las autoridades citadas por la apelante · puede encóntrarse en el de *Pennsylvania Railroad Co.* v. *McGin,* 61 Md. 108, y *Rodríguez* v. *N. Y. N. H. & H. R. Co.,* 96 N. E. 684, citados en el sentido de que sostienen que—

"La negligencia de una compañía ferroviaria en cortar su tren y correr la máquina rápidamente en frente de los carros que la siguen no excusa la negligencia contributoria de una persona que es arrollada y estropeada en un cruce o paso a nivel."

Y se cita el caso de *Woodward* v. *N. Y. L. E. R. Co.,* 106 N. Y. 369, para demostrar que "esta teoría es aplicable a cruces y calles."

No tenemos a mano el tomo 61 de Maryland Reports, ni encontramos el primero de los tres casos citados últimamente y anotado en el Century Digest.

El sumario del caso de *Rodríguez* v. *N. Y. N. H. & H. R. Co.* dice lo siguiente:

"Cuando se demanda a una compañía de ferrocarriles con arreglo al estatuto de 1906, capítulo 463, parte 2, número 245, que establece una responsabilidad contra una compañía de ferrocarriles que no pone las señales que la ley manda en los cruces por virtud de lo cual se ocasiona la muerte de un viajero, a menos que la negligencia crasa o voluntaria, o el acto ilegal del mismo contribuyera a su muerte, tiene la obligación de probar la negligencia crasa o voluntaria o acto ilegal del interfecto como causa contributoria.

"El demandante que establece la acción de acuerdo con el estatuto de 1906 y la ley 463, parte 4, No. 63, como fué enmendado por el estatuto de 1907, capítulo 392, el cual establece la responsabilidad contra una compañía de ferrocarriles por la muerte de una persona en el ejercicio del debido cuidado, debe probar que el viajero muerto en un cruce en una pendiente ejercitó sus facultades para protegerse y cuando él meramente demuestra que el interfecto fué visto últimamente al salir de una cantina a una distancia de varios minutos de un cruce y que poco después su cadáver fué encontrado en el cruce bajo un carro de carga, pero deja de probar que el finado tomó alguna precaución para su propia seguridad al acercarse a la vía, no demuestra que él ejercitó debido cuidado.

"El estatuto 1906, c. 463, Pt. 2, sección 147, que prescribe sobre las señales de los trenes que se aproximen a los cruces en la carretera, al ser considerado en relación con la sección 245, que hace responsable a una compañía de ferrocarriles que deja de dar señales, por la muerte de un viajero en un cruce, a menos que dicho viajero fuere culpable de negligencia crasa o voluntaria, o del acto ilegal que contribuyó a su muerte, se aplica solamente cuando la locomotora misma o los carros que la acompañan pasen un cruce, y no es aplicable cuando en un desvío un solo carro desprendido de una locomotora pasa un cruce."

Con respecto a este último particular la corte dijo:

"La inferencia necesaria de las referidas secciones 147 y 245 es que el pito o campana deben tocarse solamente cuando la propia locomotora o carros que la acompañan pasan el cruce. White v. N.

Y., N. H. & H. R. R., 200 Mass. 441-444, 86 N. E. 923. La razón
de esto bien puede ser que la legislatura no tuvo la intención de
establecer lo que en dichos casos podría ser casi un perjuicio pú-
blico intolerable producido por el ruido en las vecindades donde las
carreteras cruzan los desvíos o vías usadas en parte para fines de
cambios, sino dejar la protección de los viajeros allí a la obligación
general que tienen las compañías de ferrocarriles en todas las cir-
cunstancias de usar el debido cuidado en todo cruce y a las facul-
tades conferidas a la Junta de Comisionados de Ferrocarriles para
ordenar la construcción de portones y estaciones para los hombres
encargados de hacer señales. Toda vez que el carro que arrolló al
causante del demandante no era uno en el cual se requieren las se-
ñales que la ley dispone, el demandante dejó de probar un caso bajo
su primera alegación.

"Resulta innecesario considerar si hubo o nó negligencia por
parte del demandado o negligencia crasa de sus empleados o agentes."

A falta de alguna discusión o análisis del caso, o compa-
ración de estatutos en el alegato de la apelante, sería super-
fluo cualquier otro comentario.

Lo que la corte por una simple mayoría resolvió en el
caso de Woodward, como se expresó en el sumario, fué que:

"Los hechos demostraron absolutamente que W. miró y al ver
que el carro venía trató de cruzar en frente del mismo, o que no
miró cuando era su deber hacerlo, y podía por tanto, imputársele
negligencia contributoria; y que el someter la cuestión a un jurado
constituía un error."

Aparte de las circunstancias consideradas como insufi-
cientes para excusar tal negligencia contributoria, los hechos
de referencia, en tanto requieran ser nuevamente citadas
aquí, están expresados en la opinión de la mayoría, a saber:

"Philo P. Woodward, causante del interfecto, estaba empleado
en una mina de carbón de piedras perteneciente a un tal Huck, que
se encontraba frente a la calle Canisteo y se extendía al sitio del fe-
rrocarril. Estando así empleado llegó a familiarizarse completa-
mente con el cruce y especialmente con el uso que tenía la estación
de desvíos de Osborn. Allí estaba colocado el carbón de piedra que
había de ser entregado en Hornellsville, y los carros que lo condu-
cían ordinariamente se colocaban en ese desvío y a través de la ca-

lle al sitio de descarga.   El demandante mismo a menudo había pre-
guntado en la oficina de carga por el carbón de su principal y dado
órdenes acerca del desvío en que habían de ser colocados los carros.
Una persona que viniera en dirección sudeste por la calle Canasteo
por el depósito de carbón de piedra de Huck, tendría a su derecha
primero un solar desocupado colindando con una palizada alta hacia
la vía y después un edificio conocido por tienda de Grotty.   Mien-
tras se pasaba por allí la vía al oeste del cruce no podía ser vista
pero cuando se llegaba a la esquina sudeste que estaba a treinta y
uno y medio pies de la intersección de la calle con la vía, podía ser
visto el desvío al oeste a una distancia de 57 pies.   Al llegar a una
distancia de diez pies de la vía podía ser visto a una distancia al
oeste de 137 pies y el mapa demuestra que cuando se llegaba a dos
pies de la vía podía divisarse la vía en toda su longitud al oeste y
además cierta parte de la vía principal.

"El causante del demandante y un tal Phelps se acercaron al
cruce conduciendo un canasto de carbón de piedra que traían del
patio de Huck y el interfecto fué arrollado en la vía que está al
sur del desvío y cuando casi estaba al otro lado del mismo por uno
de los carros de carbón echados del oeste y que se movían por su
propio impulso.   El accidente ocurrió un día claro y bueno cuando
nada había que pudiera obstruir o entorpecer la vista, cuando el
perjudicado iba a pie y pudo haber parado en cualquier momento
y cuando de una simple mirada al desvío hacia el oeste hubiera po-
dido descubrir el peligro que amenazaba.   El carro y el hombre es-
taban en la intersección de la vía y el carro.   La mayor velocidad
del primero se dice que era cuatro millas por hora y si pensamos
que el paso del segundo era tan lento como una milla por hora los
carros se movían a razón de cuatro pies mientras él a uno, y cuando
estaba a dos pies del cruce ellos no se encontraban sino a cuarenta
pies del mismo y moviéndose hacia él en su dirección a la clara
vista.   Si él iba andando más ligero ellos estaban todavía más cerca
y es absolutamente cierto que en cualquier momento a una distancia
de diez o quince pies el interfecto sólo tenía que mirar y detenerse
para estar seguro.   En verdad que Cook, llamado por el deman-
dante, jura que los carros estaban a una distancia de diez o doce
pies de ellos cuando los dos hombres cruzaron la vía, de modo que
los hechos demuestran absolutamente que Woodward y Phelps o
bien miraron y viendo que el carro venía trataron de cruzar frente
al mismo, o no miraban cuando esto era su deber y pasaron ciega-
mente por la vía asumiendo el riesgo de lo que pudiera ocurrir.   La
prueba es muy simple en cuanto a que uno u otro de ellos miró real-

mente hacia el oeste después de pasar la tienda de Crotty. Phelps admitió que él sólo miró al pasar por esa tienda y por consiguiente cuando sabía que él no había tomado precauciones contra el peligro· de los carros que se colocaban en el desvío y que probablemente podían venir a dicho desvío en cualquier hora del día; pero si ellos realmente miraron después de pasar ese sitio, es inevitable la inferencia de que ellos vieron los carros que se aproximaban y se equivocaron en cuanto a su habilidad para cruzar por frente a ellos. El caso es uno en el cual la prudencia ordinaria y cuidado no quedaron demostrados ni pudo inferirse, y por lo cual no puede darse ninguna excusa o disculpa.''

Tres de los siete jueces en una opinión disidente muy razonada están de acuerdo con el criterio de que el caso en conjunto no constituye excepción alguna a la regla general de que la cuestión de negligencia contributoria *vel non* según las circunstancias que pueden o nó excusar tal negligencia debe dejarse a la consideración del jurado. Véase también el caso de *Oldenburg* v. *New York Central & Hudson River R. R. Co.*, 124 N. Y. 414, 26 N. E. 1021, y casos citados, donde la misma corte tuvo un criterio unánime al sostener y confirmar la regla general.

En tanto la ley que regula los accidentes en las calles o cruces esté aquí envuelta, en caso como ha sido desarrollado en el juicio parece ser más fuerte para la demandante que como se indica en la demanda o en las conclusiones.

Al pasar la locomotora el causante de la demandante estaba sentado o parado en un cruce de una calle entre la estación y la curva al cual acababa de llegar la locomotora, y a unos ocho o diez metros de la estación al otro lado de la vía en un punto diagonalmente a través de la estación. Su vista en la dirección de la cual el no sospechado peligro surgió, quedaba obstruida. Estando ya parado no tenía que detenerse antes de empezar a andar. El pequeño ruido que los rápidos carros en movimiento hayan podido hacer quedó eliminado por el sonido de la locomotora que pasaba y los gritos de la muchedumbre en la estación.

Varias personas que estaban algo más lejos del cruce de

la calle y más directamente en sentido opuesto a la estación lograron cruzar por detrás de la locomotora y antes de la llegada de los carros sueltos.   Uno de éstos en el momento en que el causante de la demandante fué arrollado pudo escapar con dificultad de igual peligro saltando de la vía.

La impresión general según resulta de este movimiento y que fué alegado en la demanda y declaró probado el juez sentenciador, fué que la llegada del tren había sido demorada.   La conclusión hecha por el mismo Rodríguez está evidenciado por sus últimas palabras que parecen haber sido muy inteligibles para todos aquellos que las oyeron y todas las personas interesadas en los hechos, no en un sentido literal sino como indicativas de la idea de que la salida de los pasajeros que esperaban el tren había sido pospuesta.

Rodríguez en vez de seguir en ángulos rectos a través de la vía en el cruce de la calle tomó una dirección algo diagonal inclinándose más o menos hacia la dirección general de sus amigos que estaban reunidos en la estación, dejando así el cruce entre el mismo y la causa del peligro.   El fué arrollado en la orilla o a una distancia de un metro o dos del borde del cruce.

A menos que tengamos que sostener que a pesar de las prescripciones de nuestro estatuto el acto de correr un tren velozmente de carros separados y sin gobierno por una curva pronunciada y por un cruce de calle de una aldea desde donde el peligro que amenazaba no podía ser visto en el día de una elección general a las tres de la tarde cuando un tren de pasajeros debe llegar, sin aviso y dentro de pocos segundos o de un minuto o dos después de pasar una locomotora que ha hecho las señales usuales y corrientes, no constituye negligencia; o que un viandante que se aproxima al cruce no tiene ningún derecho a creer que han de hacerse las señales corrientes que la ley manda, ni confiar en sus oídos cuando su vista estaba obstruída o que tal viandante, encontrándose sentado o parado a un metro o dos o menos de la vía debe primero andar y después pararse, mirar y

oir, antes de dar el paso que le ha de llevar a la vía, aún cuando no haya de oirse ningún sonido y mirar de nada sirve; o que cualquier desviación o separación, por ligero que sea de la parte frecuentada del cruce de la calle convertirá a tal viandante en un transgresor ordinario sin derecho alguno a recobrar, a falta de una intención deliberada de matar, aun cuando tal proceder proporcione más espacio y distancia entre él y el peligro imprevisto y en manera alguna contribuye a su perjuicio; o que la cuestión de negligencia contributoria, en tales circunstancias, es puramente una cuestión de derecho y no de hecho o de hecho y derecho; entonces de acuerdo con nuestro estatuto parece que ha habido en este caso la triple obligación por parte de la demandada y el triple deber hacia Pedro Rodríguez debido a la proximidad inmediata de la estación del cruce y de la curva, y la justicia substancial del fallo apelado es en semejante proporción más aparente.

[8] No incumbe a esta corte establecer la corrección absoluta de ese resultado fuera de toda duda, ni debemos investigar por nuestra propia iniciativa y resolver cuestiones que son más o menos dudosas y que no han sido levantadas ni discutidas por la apelante. Si la doctrina de la última oportunidad (*last clear chance*) o la muy gastada teoría de negligencia relativa, está en realidad envuelta, una resolución final respecto a hasta qué punto están envueltas y si fuere necesario el debido alcance y autoridad del presente caso como precedente también pueden dejarse para el futuro. El caso ya ha consumido una cantidad de tiempo y trabajo que está fuera de toda proporción con su importancia intrínseca, como se verá de nuestra conclusión en relación con el décimo señalamiento de error.

Además de las autoridades ya citadas y como punto de partida para ulterior investigación, por ahora estamos satisfechos con llamar la atención a los siguientes casos: 22 R.C.L. 945; sec. 87; 971, sec. 203; 973, sec. 204; 980, sec. 211; 995, sec. 224; 1000, sec. 228.

[9, 10] Nos inclinamos a convenir con la apelante en que la más corta esperanza de vida de la demandante debe tomarse en consideración al determinar los daños y perjuicios y que desde este punto de vista la cantidad concedida por la corte inferior es algo mayor que lo que las circunstancias, incluyendo tal esperanza, puede decirse que justifican. 8 Cal. Jur., p. 1018, sec. 61; 17 C. J. págs. 1331, 1332, 1354, secciones 202 y 241.

Sin embargo, la demandante que es una mujer de cincuenta años fué a la silla testifical y el juez sentenciador estuvo en condiciones de formar por su apariencia general, físico, fortaleza mental y corporal, alguna idea y tal vez un concepto más exacto y justificado de su término razonable de vida que la que pudo haber tenido por virtud de una prueba pericial y listas de mortandad.

Pedro Rodríguez ganaba de $6 a $8 semanales y con esto proporcionaba lo necesario para su sostenimiento, de su esposa y madre la demandante, que tenía otros hijos pero ningún otro medio de suministrarse su sostenimiento.

Asumiendo que la demandante recibía más o menos una tercera parte del salario de su hijo, esto ascendería a lo menos a la suma de $100 anuales.

Atendidas todas las circunstancias, y dando a la demandante y a la corte inferior el beneficio de cualquier duda razonable, creemos que la cantidad de $1,500, intereses y costas, sería un cálculo conservador y razonable.

*Debe modificarse la sentencia apelada de conformidad con lo aquí expuesto, y, así modificada, confirmarse.*

Los Jueces Asociados Sres. Wolf y Aldrey disintieron.